CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
APR 14 2022
JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal Action No. 4:20-cr-00018 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| ALAN JAX WAGONER | ) | United States District Judge |

**MEMORANDUM OPINION AND ORDER**

Pursuant to a second superseding indictment, Alan Jax Wagoner faces charges of: (1) possessing firearms as a convicted felon in violation of 18 U.S.C. § 922(g)(1); (2) possessing an unregistered firearm (a weapon made from a shotgun) in violation of 26 U.S.C. §§ 5841, 5861(d), 5871; and (3) possessing ammunition as a convicted felon in violation of 18 U.S.C. § 922(g)(1). (Dkt. No. 62.)

Pending before the court is Wagoner's motion to suppress tangible evidence recovered from his pick-up truck (the "truck"). (Def.'s 2d Mot. To Suppress (hereinafter "Mot."), Dkt. No. 64.) Wagoner states in his motion that the two firearms[1] the officers found in his vehicle were the product of an unreasonable search because the "police trespassed into his vehicle intending to look around," without a legitimate purpose or valid exception to the warrant requirement. (*Id.* at 3–4.) He asserts that the officers claimed to have found two firearms under the front seat and then later claimed that they found them while conducting a protective sweep of the truck. (*Id.* at

---

[1] The motion seeks suppression of the "fruits of the initial search and of the searches based on the first violation," but the motion mentions only the two firearms found in the cab of the truck. Until the government filed its brief in opposition, the court remained unaware of firearms and ammunition found in the open bed of the truck because the motion to suppress omits any reference to them. As noted in Wagoner's reply brief (Dkt. No. 81 at 3 n.4), the court advised counsel that it expected counsel to include relevant facts in its motion. The court did not indicate that it had determined that any firearms or ammunition were in plain view, but only that it should be made aware of pertinent facts. Of course, items in an open bed of a truck may or may not be in plain view. Moreover, Wagoner later stated that he was seeking to suppress the firearms and ammunition found in the open bed of the truck (*see, e.g.,* Motion to Suppress Hearing Transcript 130:15–18, Dkt. No. 108); thus, the information was clearly relevant to the motion.

1.) He then represents that "police went inside [Wagoner's] pickup with the intent … to see what was inside" and that "only once police were physically inside [Wagoner's] pickup were they able to see any firearms." (*Id*. at 3–4.) Further, he claims that:

> …none of the alleged firearms were found in plain sight. Police observed one stuffed under Alan's [Wagoner's] driver seat, not observable from outside, while they were rooting through this pickup. They found another gun after searching further. But none of their observations were made while standing outside of the truck. None were made from an area where police had authority to be looking.[2]

(*Id*. at 6.)

The government responds in opposition that the firearms under the seat in Wagoner's truck were in plain view because Wagoner left the driver's side door open when he fled the vehicle (Gov.'s Br. at 3, Dkt. No. 68), and it provides a photograph of the vehicle illustrating that anything under the driver's seat of the truck is in plain view to an individual standing outside of the truck with the driver's side door open. (Gov't.'s Ex. C, D, Dkt. No. 106-1 at 3–4.) The government also cites Lt. Travis Hambrick's incident report, which states:

> Wagoner had left the driver's door open on his truck. Under the driver's seat of the truck, I observed an assault rifle pistol and what appeared to be a 1911 pistol. In the bed of the truck I observed several burnt firearms and hundreds of rounds of ammunition and an ammunition metal box.

(Gov't.'s Ex. H, Dkt. No. 106-1 at 10.)

In response, Wagoner argues that it is unlikely that the officers observed the firearms in plain view because they did not use that term in the incident report and the firearms in the bed of the truck were taken apart and burnt, "more closely resembl[ing] scrap metal than firearms." (Dkt. No. 81 at 1.) Wagoner cites a photo of his truck to illustrate that it was filled with many scrap materials, making it is difficult to identify the materials in the bed of the truck. (Dkt. No. 81-2; Gov't.'s Ex. B, Dkt. No. 106-1 at 2.)

---

[2] No evidence was presented to support these representations.

In advance of the hearing on the motion to suppress, Wagoner filed a motion to compel the government to examine personnel records of its agent-witnesses. (Dkt. No. 95.) Wagoner argued that Deputy Robert Griffith's personnel file is likely to contain evidence that he misled or was dishonest with the government attorneys related to his job performance and the reason he was reassigned from a sergeant position to a deputy position. The government explained that it had already reviewed Griffith's personnel file and provided Wagoner with any exculpatory or impeachment material. (Dkt. No. 96.) As such, Wagoner's motion to compel is moot. The government also filed a motion in limine regarding cross-examination of Griffith at the suppression hearing. (Dkt. No. 97.) Wagoner failed to file any opposition to this motion. At the hearing on the motion to suppress, the court noted that the government could object to any questions of Griffith that it thought were improper given its unopposed motion.[3]

Because the court finds that the firearms under the front seat of the truck and in the bed of the truck were in plain view and that the officers never entered the truck or moved any items in the bed of the truck to view the firearms and ammunition, the court will deny Wagoner's motion.

I.  BACKGROUND

Both officers at the scene, Lt. Travis Hambrick and Deputy Robert Griffith, testified at the hearing on the motion to suppress, and the factual background is taken from the evidence at that hearing.

**A. Factual Background**

On January 26, 2020, at approximately 2:00 a.m., Hambrick and Griffith of the Henry

---

[3] The hearing was continued for additional briefing and possible additional testimony when Wagoner attempted to call the Assistant United States Attorney to the stand. The government objected pursuant to *Touhy v. Ragen,* 340 U.S. 462 (1951). This issue was later mooted in lieu of a motion to dismiss for prosecutorial misconduct, addressed in a separate opinion and order. Because there is no further testimony requested or required and there are no issues to address at a continuation of the motion to suppress hearing, the motion to suppress is ripe for decision.

County Sherriff's Office responded to a report of a suspicious vehicle in Axton, Virginia. (Motion to Suppress Hearing Transcript (hereinafter "Tr.") 9–11, Dkt. No. 108.) When they arrived in the area, the officers observed a white Dodge pickup truck towing a gray van, followed closely by a Cadillac. (*Id.* at 10.) Because the van matched the description of the suspicious vehicle and was being towed with a chain, which is illegal, Griffith "cut on his emergency lights to initiate a traffic stop." (*Id.* at 10, 11; Def.'s Ex. 1 1:01, Dkt. No. 106.) At that point, the van unhooked from the truck; the truck continued, with the chain dragging, to drive away. (Tr. 11; Def.'s Ex. 1 1:02–1:25.) Hambrick pursued the truck while Griffith investigated the van. (Def.'s Ex. 1 1:20–2:40.) Video from Griffith's cruiser was provided to the court and captured some of these events. (Def.'s Ex. 1, Dkt. No. 106.)

Hambrick turned on his emergency lights; however, the truck did not stop. (Tr. 11.) The truck turned into a gravel driveway and started to slow down. While the truck was still moving, the driver's side door opened. (*Id.*) Thinking the driver was going to flee on foot, Hambrick pulled up to the driver's side and started giving the driver commands to "stop the vehicle." (*Id.* at 13.) By this point, Hambrick had identified the driver as Wagoner, who had "prior dealings [with Hambrick] at his residence." (*Id.* at 12.)

Wagoner exited the vehicle and started walking down the driveway despite Hambrick's commands to stop. (*Id.* at 13.) The truck was still running, and the driver's side door of the truck was left wide open, which door is depicted in the cruiser video. (*Id.*; Def's Ex. 1 2:58.) With his firearm out, Hambrick pepper sprayed Wagoner, pushed him in the back, and got on top of Wagoner after he fell to the ground. (Tr. 60, 61.) Hambrick struck Wagoner in the face with

his forearm to apprehend him. (*Id.* at 67.) Griffith arrived on the scene.[4] (Def.'s Ex. 1 2:58.) After assisting Hambrick with Wagoner, Griffith went back up the driveway to Wagoner's truck. Hambrick remained with Wagoner.

Griffith stood "three to four feet" from the open driver's side door and used a flashlight to look in the cab of the truck. (Tr. 82, 83.) Griffith saw two guns "in the floorboard under the steering wheel" of Wagoner's truck—an assault rifle pistol and "what appeared to be a 1911 pistol." (*Id.* at 82.) On the radio, Griffith can be heard stating, "He's got an AR up under the front seat." (Def.'s Ex. 1 8:32–8:45.)

Sometime after the officers had Wagoner in custody, Hambrick walked up to the truck to make sure no other persons were present, stood three to four feet from the open driver's side door with a flashlight and observed "two firearms underneath the front driver's seat." (Tr. 18, 19.) The two firearms looked like a "1911-style pistol" and an assault rifle pistol. (*Id.*) He then took "a look around the rest of the vehicle [] to make sure nobody was in the bed." (*Id.* at 19.) In the exposed bed, Hambrick "noticed what appeared to be…firearms that had been in a fire and [] melted."[5] (*Id* at 19, 24.) Later, Griffith also saw the "burnt up" "rifles and shotguns" and ammunition in the exposed bed. (*Id.* at 84.)

As is common practice with the Sheriff's Office, Hambrick applied for a search warrant based on these observations and his knowledge of Wagoner's felony status. (*Id.* at 31–33.) A search warrant was issued and executed, and the officers recovered firearms and ammunition

---

[4] Griffith was demoted from investigator to patrol sometime after these events but unrelated thereto. He was told it was due to performance deficiencies which he attributes to memory issues from PTSD from serving in Iraq. (Tr. 95:1–4.) No evidence was presented regarding memory issues regarding the events at issue in this case.

[5] Hambrick had a body camera on and activated it, but he testified that the video is choppy, the cameras malfunction, and that the Sheriff's Office has had problems with the body cameras and has ordered new cameras. In any event, no body camera footage was offered into evidence.

from the truck.  (Gov't.'s Ex. I, Dkt. No. 106-1.)  Hambrick took photographs of the items he seized pursuant to the warrant, but he later discovered, when asked about them by the Commonwealth Attorney, that those photographs never properly transferred to the computer system and, by the time of discovery, the Sheriff's Office had new computers.[6]  (*See* Tr. 38–42.)

Some of the photographs show a clear line of sight outside the truck, with the open door, to a large observable area in front of and under the driver's seat.  (Gov't.'s Ex. B, C, Dkt. No. 106-1 at 2–3.)  Additionally, the investigative report notes "I then went and checked Wagoner's truck to see if anyone else was in the truck.  Wagoner had left the driver's door open on his truck.  Under the driver's seat of the truck, I observed an assault rifle pistol and what appeared to be a 1911 pistol.  In the bed of the truck, I observed several burnt firearms and hundreds of rounds of ammunition and an ammunition metal box."  (Gov't.'s Ex. H, Dkt. No. 106-1 at 10.)  Consistent with the testimony, there is no reference to any protective sweep in the investigative report.  While the report does not use the term "plain view", it does not indicate that either officer ever entered, or moved any observed items in, the cab of the truck or the bed of the truck.

## II.  DISCUSSION

### A.  Legal Standards

Motions to suppress are decided by the court, not the jury.  *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005).  The district court is empowered to make findings of fact, and conclusions of law.  *Id.*  "At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge."  *United States v. Ramirez-Solis*, 518 F. Supp. 3d 896, 906 (W.D. Va. 2021) (quoting *United States v. McKneely*, 6

---

[6] Photographs, however, were taken by an ATF agent at some time.  (*See, e.g.,* Gov't.'s Ex. A, Dkt. No. 68-1.)

F.3d 1447, 1452–53 (10th Cir. 1993)).

To establish a Fourth Amendment violation, "[a defendant] must first prove that he had a legitimate expectation of privacy in the place searched or the item seized." *United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000) (citations omitted). Once the defendant establishes a legitimate expectation of privacy, "the burden shifts to the government." *United States v. Adkinson*, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981); *United States v. Matlock*, 415 U.S. 164, 177–78 n. 14 (1974)).

## B. The Stop of the Truck Was Lawful

The court first notes that the stop of Wagoner's truck was lawful, and Wagoner admits that it was. Law enforcement responded to a call about a suspicious vehicle. In that area, they spotted three vehicles. The van that had been reported, the truck illegally towing the van with a chain, and a Cadillac that fled upon arrival of law enforcement. Wagoner's motion states that Wagoner's truck "drifted into the other lane and the van became detached from the truck" while being followed by law enforcement. (Mot. 1.) Wagoner, through counsel, did not contest the lawfulness of the stop at the hearing – "I'm not contesting that the stop wasn't lawful; it was." (Tr. 57.) He then qualified the lawfulness of the stop stating, "The reason it happened to be lawful is, after they initiated the stop, they observed something before the stop then occurs. It's lawful legally, but it could have just as easily been unlawful." (*Id.*) Indeed, the stop was lawful.

The court addresses this issue for two reasons. First, Wagoner seems to argue that the stop is relevant to the officers' states of mind preceding the search and that, somehow, the nature of the stop calls into question their motive. However, a law enforcement officer's motive or state of mind, absent very limited circumstances, is irrelevant to Fourth Amendment analysis. *See, e.g., Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) ("An action is 'reasonable' under

7

the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action. The officer's subjective motivation is irrelevant."); *Whren v. United States*, 517 U.S. 806, 811–13 (1996) (motive does not invalidate "objectively justifiable behavior under the Fourth Amendment" and "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis").

Second, in discussing the stop, Wagoner sought to question Hambrick about his cruiser camera which, according to testimony, had not worked for about one year prior to this stop. Then, defense counsel requested *Jencks* materials regarding any documents Hambrick might have written about the cruiser camera when it stopped working. The government noted that it was unaware of any such material. The court directed that counsel continue with the relevant issues before the court, offered Wagoner the opportunity to file a written motion and brief if he so desired, refused to suspend the proceedings, allowed counsel to make a proffer on the record outside the presence of the judge, and continued the hearing (following all testimony and argument). Twenty-five days after the suppression hearing, Wagoner filed an untimely written objection.[7] (Dkt. No. 116.) No motion or briefing was ever filed regarding the *Jencks* issue, and the court deems the matter waived.

## C. The Plain View Doctrine

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. "As a general rule, warrantless searches or seizures are per se unreasonable." *United States v. Williams*, 592 F.3d 511, 521 (4th Cir. 2010). "But there are 'a few specifically

---

[7] "If a litigant believes that an error has occurred (to his detriment) during a federal judicial proceeding, he must object in order to preserve the issue. If he fails to do so in a timely manner, his claim for relief from the error is forfeited. 'No procedural principle is more familiar to this Court than that a ... right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'" *Puckett v. United States*, 556 U.S. 129, 134 (2009) (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944).

established and well-delineated exceptions.'" *Id.* (quoting *Mincey v. Arizona,* 437 U.S. 385, 390 (1978) (quoting *Katz v. United States,* 389 U.S. 347, 357 (1967))). "One such exception is that 'under certain circumstances the police may seize evidence in plain view without a warrant.'" *Id.* (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 465 (1971)). "The 'plain-view' doctrine provides an exception to the warrant requirement for the *seizure* of property, but it does not provide an exception for a *search*" because "[v]iewing an article that is already in plain view does not involve an invasion of privacy and, consequently, does not constitute a search." *United States v. Jackson*, 131 F.3d 1105, 1108 (4th Cir. 1997). Police may seize evidence in plain view if the seizing officer is lawfully present at the place from which the evidence can be plainly viewed, and the object's incriminating character is immediately apparent. *Williams*, 592 F.3d at 521 (citing *United States v. Legg,* 18 F.3d 240, 242 (4th Cir.1994); *United States v. Uzenski,* 434 F.3d 690, 707 (4th Cir. 2006)). "The plain-view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession *but not privacy.*" *Id.* (citing *Illinois v. Andreas,* 463 U.S. 765, 771 (1983)).

  Here, the court finds the testimony of the officers to be credible and finds that the firearms under the front seat of Wagoner's truck were in plain view to the officers standing outside the truck. While the officers' testimony differed slightly as to the location of the firearms in the cab, both officers testified that they observed in plain view, from a distance, the firearms either under the driver's seat or on the floor near the edge of the driver's seat. The officers' testimony is corroborated by the photographs of the pickup truck that show that the front seat of the truck is stripped of its covering and the area below the seat is clearly visible from the exterior of the truck while the front door of the truck is open. (Gov't.'s Ex. B, C, Dkt.

No. 106-1 at 2–3.) Additionally, the cruiser video from that evening demonstrates that Wagoner left the driver's side door of the truck wide open, and Wagoner does not dispute that he left this door open. (Def.'s Ex. 1 2:58–2:59.) Furthermore, the cruiser video records an officer stating that he saw a rifle under the front seat of Wagoner's truck. (Def.'s Ex. 1 8:32–8:45 ("He's got an AR under the front seat").) The defendant even concedes in his motion to suppress that "police could easily see within the passenger compartment of the pickup." (Mot 5.) Finally, the investigative report is consistent with the testimony and with a plain view observation of the weapons in the cab of the truck. Taking these facts together, the firearms[8] located under the front seat of Wagoner's truck were in plain view to an officer standing outside the driver's side of the truck while the door was open. Therefore, the court will deny Wagoner's motion to suppress.

**D. The Automobile Exception**

Wagoner argues that the firearms and ammunition seized from the bed of the truck could not have been in plain view due to the large amount of scrap metal and other materials piled in the bed of the truck. Based upon the evidence, the court finds that ammunition and at least portions of firearms were observed by the officers in plain view in the bed of the truck. Nonetheless, even if the firearms and ammunition in the bed of the truck were not in plain view, the seizure of these items was valid under the automobile exception. (Dkt. No. 68 at 10 n.4.)

"In *Carroll v. United States*, 267 U.S. 132, the Court held that a warrantless search of an automobile stopped by police officers who had probable cause to believe the vehicle contained contraband was not unreasonable within the meaning of the Fourth Amendment." *United States*

---

[8] In his briefing, Wagoner does not argue that there were no firearms under the front seat of his truck, but rather, he argues that such firearms were not in plain view. (Dkt. No. 64, 81.) Wagoner also takes issue with the fact that Griffith's radio message only notes the AR; however, even if it were only one gun, the officers would still have probable cause to search the vehicle as explained in the next section.

*v. Ross*, 456 U.S. 798, 799 (1982). The search of the vehicle may be as thorough as a magistrate could authorize in a warrant "particularly describing the place to be searched." *Id.* Furthermore, for the automobile exception to apply the car must be "readily movable" in the sense that it is clearly operational and the party responsible for the vehicle's flight is on the scene. *United States v. Brookins*, 345 F.3d 231, 238 (4th Cir. 2003). In *Brookins*, the Fourth Circuit held that the automobile exception applied to the warrantless search of a defendant's vehicle where officers located the vehicle in the defendant's mother-in-law's driveway approximately 15 minutes after defendant's wife used it to flee scene of defendant's arrest, and officers had probable cause to conclude that vehicle contained contraband. *Id.* at 237. "Even in cases where an automobile [is] not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception." *United States v. Kelly*, 592 F.3d 586, 590–91 (4th Cir. 2010) (quoting *California v. Carney,* 471 U.S. 386, 391 (1985)) (applying the automobile exception where defendants were handcuffed and under arrest at time of search).

      Here, the automobile exception applies to the firearms and ammunition seized from the bed of Wagoner's truck. When the officers saw the firearms under the front seat of the truck in plain view, that provided them with probable cause to search for additional firearms in the bed of the truck. Additionally, the officers were aware of Wagoner's criminal history, which further supported probable cause to search the bed of the truck. Moreover, the truck was mobile in the sense that it was operational, and Wagoner had just fled the truck leaving it running with the front door wide open. Therefore, even if the ammunition and firearms in the bed of the truck were not in plain view, the officers properly seized the items pursuant to the automobile

exception. And, even if the automobile exception did not apply, the officers obtained a valid search warrant before seizing any items from the truck.

## III.  CONCLUSION

For the reasons stated herein, it is ORDERED that Wagoner's motion to suppress (Dkt. No. 64) is DENIED. It is further ORDERED that Wagoner's motion to compel the government to examine personnel records of its agent-witnesses (Dkt. No. 95) is DENIED as moot.

Entered: April 14, 2022.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge