IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

United States of America

      v.                    Docket No. 4:20-CR-18-EKD

Alan Jax Wagoner

**Defendant's Sentencing Memorandum**

      A famous episode of the Twilight Zone centers on the irony that makes Mr. Wagoner's life so painful. The protagonist, an avid reader and somewhat of a misanthrope, survives a nuclear explosion after spending his lunch break reading in a bank vault. After initially deciding to kill himself, the protagonist is overjoyed at happening upon a library. He spends hours sorting the books he intends to read, only to have the episode conclude when he breaks his glasses, melancholy that he finally had time.

      A similar sense of irony pervades literature because irony pulls at one's heartstrings. The Gift of the Magi focuses on poor lovers who each sell their most prized possession to buy a gift for the other. One sells her hair to buy a chain for his watch. The other sells his watch to buy combs for her hair. Mr. Wagoner's case is imbued with a similar sense of irony.

      Alan was always a talented young man, but his talents really shined when it came to guns. He could build guns, fix guns, assemble guns, and build guns. A talented gunsmith whose rights to possess firearms were forfeited when he was found in possession of a short rifle in 2018—a rifle he undoubtedly assembled by mixing parts of other firearms together.

      Not too long after he was convicted of that offense, his house burned to the ground in a fire that engulfed everything he had ever owned. And though he was charged with possessing several firearms and hundreds, if not thousands, of rounds of ammunition, he

was convicted only of possessing one firearm. He was acquitted—specifically—of possessing a short barrel shotgun that subjected him to increased recommended penalties. And yet, though he was acquitted of all but one charge, his sentencing guidelines recommend a sentence as if he were convicted of all his charges. What, then, is the virtue of the jury acquitting him of nearly every charge of which he was accused? This court has a choice in sentencing Mr. Wagoner—to ignore the jury's verdict or to honor it. Mr. Wagoner requests the court sentence him to a period of incarceration that reflects his conduct, his minimal criminal history, and that otherwise accomplishes the goals of sentencing. In this case, he argues that a sentence of twenty-seven months is sufficient, but not greater than necessary.

**Alan's early life and minor criminal history show that a lengthy sentence of imprisonment is not necessary.**

Mr. Wagoner's early life gave him a work ethic and simple tastes that have remained with him since. He witnessed adversity through family struggles and himself struggled with adolescent behavioral issues. His mother ultimately decided that Alan would fare better living with his grandparents, and while still a teenager, he went to Virginia to live with them. Many people might view a childhood involving divorce, domestic violence, alcoholism, early exposure to drugs and alcohol, and an episode of physical abuse as one of tragedy. Alan experienced all these things but never viewed them as anything tragic. For him, his life was relatively unremarkable for a blue-collar kid.

Alan developed an early love for the trades and working with his hands. His grandparents taught him the value of hard work, and Alan decided with them to stop going to school and focus on work. He received his GED and began working at fifteen, and Alan has spent most of his life hard at work.

Like most people who keep to themselves, Alan had little involvement with law enforcement for most of his life. In his early twenties, he received a DUI and was convicted

of two incidents involving misdemeanor allegations of violence. Then for around fifteen years, Alan remained free of most trouble with the law, but he did not manage to avoid angering law enforcement. Despite a few interactions with police, Alan had not received any felony convictions nor spent more than a month in jail until he was more than forty years old.

Alan might never have been convicted of a felony but for his antagonistic relationship with a particular Henry County Sheriff's Deputy. Alan lived off the gird on a large plot of property. He used the property to hunt and largely to stick to himself. But he also used it to test fire weapons on which he was currently working. One morning, Alan was testing whether a particular part in an AR-style pistol was milled correctly. Alan knew that to test the part, he could "fan" the rifle, making it sound as if it were firing at a high rate of speed. Neighbors, or one particular neighbor, got concerned and called the police. And the police came to investigate.

One of Alan's neighbors was also a Henry County Sheriff's Deputy. Off duty at that point, he came onto Alan's property, while other officers were there, to yell at and accost Alan for shooting guns in the morning. He threatened Alan, assaulted Alan's houseguest, and escalated an otherwise calm situation. According to the government, that deputy was fired for his conduct. Though Alan was peaceful with the police, the firearm he had assembled appeared to have a shorter barrel than necessary. Police secured a warrant and came back early the next day to execute it. Because Alan had a lot of guns, police took extra precautions. In this case, those precautions were a SWAT team, complete with snipers and an armored personnel carrier. Perhaps if police had just knocked on his door, Alan would have answered. Alas, they did not and he did not. Rather than comply with the police's commands, Alan did nothing. He did not open the door and walk out, nor did he respond to

their commands. He sat on his bed, surrounded by guns, and waited until the police broke down a door and physically put him in handcuffs.

From that day on, Alan's life would change. Alan's felony conviction meant not only that he would spend time in jail (five months—the longest he had spent in jail by several months until his current incarceration), but that he would lose his rights to possess firearms. For Alan, firearms helped to give his life meaning. Like many people in rural Virginia, Alan liked guns. He did not like guns because they were violent or had the possibility of inflicting death, but in part because they fascinated him. Guns were complex puzzles that had historical and societal importance. Like many people who devote time to a hobby or a business, Alan identified with his ability to work on firearms. When he lost his right to possess firearms, it was like he lost a part of himself—a part of his identity.

Though Alan had a few interactions with the law, almost all were minor. Until his current incarceration, he had spent, by counsel's calculation, less than a year in jail total and the longest period of time was around six months. Alan's two felony convictions are non-violent: one for having a firearm with a shorter barrel than necessary, and another for having prescription pills in his possession while in the jail. None of his history suggests that he currently presents any danger to the public that could be prevented by his incarceration. Indeed, his history suggests that Alan is likely to return to a quiet life when released from custody.

**Alan's family life provides support and a motivation to do better.**

Alan was supported at trial by his aunt, and he has remained in regular contact with his family while incarcerated. His mother would have been there to support him, but she was sick with COVID at the time. Before his arrest in 2020, Alan had a fraught relationship with his mother. When he was first arrested, she was furious at him for seeming to prioritize guns more than his own child. She no longer feels that way about

Alan. While in custody, Alan has regularly contacted his son and been as much a father to him as any incarcerated parent can be. More importantly, Alan has demonstrated to his mother, his family, and to his son that he can be and wants to be a father.

While in custody, Alan's own father passed away, and Alan stands to inherit the property and trailer where his father lived. His family has spent time and resources fixing up that old trailer so that Alan will have a place to live when released. His mother has been caring for his son, and both are ready to return Alan's son to his care.

Whenever Alan is released—be it in years, given the government's request, or in weeks or months, given his—Alan will return to a life where he works to support himself and his family. But he has also lived through a harrowing experience that has helped to focus his desires. His house and all his possessions burnt to the ground, and since that day, he has been locked up in a local jail with few opportunities for any of the daily activities that give life meaning. The few regular activities he had—his regular contact with his family—reminded him of what is important in life. Alan's mother has confirmed that Alan appears to have responded differently to incarceration this time.

Alan's family is supporting him in different and more helpful ways now then before he was arrested for this charge. Alan's tragic house fire had already caused him to fall back on them for support. But in losing everything he owned, Alan was able to focus on the important things in life, finally learning that you can't take it with you.

**The conduct for which Alan was convicted does not warrant a sentence within the recommended guideline range.**

After three days of evidence and about as many hours of deliberation, a jury acquitted Mr. Wagoner of all but one charge—possession of a single firearm (a standard rifle, albeit one with significant damage) after having been convicted previously of a felony. The government unsuccessfully sought convictions alleging that Mr. Wagoner possessed a

short-barrel shotgun, many other firearms, and hundreds or thousands of rounds of ammunition. Of course, the standard the of proof that the jury applied is considerably greater than the standard of proof that applies at sentencing. As such, this case presents another circumstance where the court is faced with sentencing a defendant to a significantly greater sentence based on conduct and charges of which he was acquitted. After all, were the court only sentencing Mr. Wagoner for conduct of which he was convicted, his recommended guidelines would be far lower and would align with Mr. Wagoner's request of twenty-seven months.

The Supreme Court has condoned this practice, though that court has never squarely addressed the issue or considered whether sentencing a defendant based on acquitted conduct violates the Due Process or the Sixth Amendment right to a jury trial. *See United States v. Watts*, 519 U.S. 148 (1997) (per curiam). The Sentencing Commission has not directly addressed the issue in the guidelines, though it has published a primer on relevant conduct that briefly addresses the topic (in two sentences). The Fourth Circuit has approved of sentencing based on acquitted conduct, but like the Supreme Court, has not squarely addressed many problems associated with the practice. *See, e.g., United States v. Lawing*, 703 F.3d 229, 243 – 44 (4th Cir. 2012) (citing *United States v. Watts* as resolving the issue).

*Watts* does not address the issue, though, before this court. The case did not even receive full briefing or full argument before the Court. *See Watts*, 519 U.S. at 170 (opinion of Kennedy, J., dissenting). Is it fair to sentence a defendant based on conduct of which he was acquitted by a jury? Should a jury's verdict of eleven not guilty findings and one guilty finding still subject a person to a recommended sentence as if they had found him guilty of all charges? Mr. Wagoner argues that the answer to these questions is "no."

Aside form obvious due process issues that arise when punishing a defendant for conduct of which he was acquitted, doing so also vitiates the right to a trial by jury guaranteed by the Sixth Amendment. One of the greatest checks on government overreach (perhaps designed for a case like this where the federal government prosecuted a man whose home burned down for allegedly possessing dozens of burnt, destroyed guns) is the constitutional role given to citizens through jury trials. *See Blakely v. Washington*, 542 U.S. 296, 302 – 05 (2004). This country has a long history—sometimes proud, sometimes tragic— of acting as the country's conscience by acquitting defendants of all or some offenses or of convicting them only of lesser included offenses. *See Jones v. United States*, 526 U.S. 227, 245 (1999). Other decisions of the court reaffirm the importance of the jury's role before a court imposes a sentence. *See*, *e.g.*, *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Taken as a whole, this country's history and tradition of using the jury system weighs heavily against rejecting a jury's verdict and sentencing defendant's based on conduct of which they were specifically acquitted.

**Regardless of the jury's verdict, Mr. Wagoner's non-violent conduct does not call for a lengthy sentence of imprisonment.**

Even if the court finds that it should consider conduct of which he was acquitted, the guidelines significantly enhance his recommended sentence without providing adequate justification. Two aspects of Mr. Wagoner's conduct are responsible for the lengthy sentence proposed by the sentencing guidelines: 1) his alleged (and acquitted) possession of a short barrel shotgun; and 2) his alleged (and acquitted) possession of several firearms. Neither justifies a lengthy sentence.

First, although short barrel shotguns are regulated separately from other firearms, they are neither inherently more dangerous nor regulated as such. Though this country once had a storied practice of fighting bank robbers hiding shotguns in trench coats by

cutting their barrels to short. Congress regulated such conduct and grouped those firearms and others thought to be more dangerous together. But now nearly any person can purchase semi-automatic rifles capable of inflicting more death and destruction than a shotgun and can do so without paying any special tax or registering the firearm. In the age of the ubiquitous AR-15, should we treat short-barrel shotguns (and particularly those that are missing components necessary to function) as more dangerous and deserving of a greater prison sentence? Mr. Wagoner argues the answer is "no."

Similarly, the allegation that Mr. Wagoner possessed multiple firearms is mitigated by his history of working on firearms. He did not possess a number of firearms because he was preparing to engage in massive violent conduct or to engage in firearms trafficking. He was alleged to have possessed a number of firearms after having been a successful gunsmith. The sentencing guidelines even contemplate that the possession of multiple firearms is not aggravating for those who are otherwise engaged in collecting. *See* USSG 2k2.1(b)(2).

**A sentence of 27 months is more than sufficient for Mr. Wagoner's conduct and to accomplish the goals of sentencing.**

Society will be no safer if Mr. Wagoner spends years longer in prison. Mr. Wagoner will not be in a better position to make a new take on life after spending years longer in prison. Mr. Wagoner's family will not be in a better position after him spending years longer in prison. Nor will society have a greater respect for the law by sentencing him to years longer in prison. Indeed, sentencing Mr. Wagoner for conduct of which he was acquitted promotes *dis*respect for the law by ignoring the jury's careful consideration of the evidence in this case.

Mr. Wagoner is approaching middle age and has, for the most part, led a life of which he can be proud. He has worked hard, struggled, thrived, and lived. He was given a

chance to start a fresh life when his house burnt to the ground in January of 2020. He has done what little he can to begin that fresh start. This court need not further burden him or society with the cost of his incarceration simply because he was a felon and was found by a jury to be in possession of one burnt firearm. Twenty-seven months is more than enough time taken from his life to pay for that crime.

Respectfully submitted,

>/s/ Benjamin Schiffelbein
>210 First Street, Ste. 400
>Roanoke, VA 24011
>Benjamin_Schiffelbein@fd.org
>Counsel for Mr. Wagoner